# IN THE COURT OF APPEALS OF IOWA

No.13-0298
Filed July 16, 2014

**DANA PETERSON,**
Petitioner-Appellant,

**vs.**

**IOWA DEPARTMENT OF HUMAN SERVICES,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Cerro Gordo County, Colleen D. Weiland, Judge.

A child care provider appeals the district court decision affirming the agency actions of issuing founded child abuse reports against her, placing her on the child abuse registry, and revoking her registration to provide day care services. **AFFIRMED.**

Richard N. Tompkins Jr., Mason City, for appellant.

Thomas J. Miller, Attorney General, and Tabitha Gardner, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**TABOR, J.**

This case arises out of an Iowa Department of Human Services (DHS) investigation into the child care provided by Dana Peterson. The investigation focused on Peterson's use of an unapproved "stackable" crib. The DHS issued founded child abuse reports against Peterson, placed her on the child abuse registry, and revoked her registration to provide day care. She challenges the agency's actions as lacking substantial evidence, negatively impacting her private rights in gross disproportion to the public benefit, and as otherwise unreasonable. Giving due deference to the agency's findings, we affirm.

*I. Background Facts and Proceedings*

Dana Peterson operated Dana's Daycare, a DHS-registered child care facility, for about seven years preceding this action. The facility is located next door to her home. Sometime before April 2011, Peterson purchased a four-unit stackable crib from a seller on Craigslist for use in the nursery area. The unit featured four spaces in which children could sleep, two on each side, and two on each level. The wood-slatted front slid up a track to allow access to the bottom cribs. The two bottom cribs were covered by the floor of the two upper cribs; the two upper cribs were open at the top. The cribs stood approximately five foot, four inches tall. Peterson did not have any manufacturer's documents or stickers indicating usage limits by age or weight.

In April 2011, Wendy Taylor, a registered nurse with North Iowa Community Action (NICA),[1] visited Peterson's facility to complete an injury-prevention checklist. Taylor's visit was routine and not prompted by a complaint. Taylor expressed uncertainty about the safety of the stackable crib unit, and said she would need to research whether the unit met DHS requirements for equipment in a day care facility. While Taylor could not locate information on Peterson's particular unit because of the missing manufacturer's identification, she researched stackable cribs and found a flyer published by Healthy Child Care Iowa, a campaign sponsored by the Iowa Department of Public Health. Taylor concluded the stackable crib unit would very likely not meet DHS requirements. During a second visit approximately a week later, Taylor gave the flyer to Peterson and offered Peterson free, metal crib units satisfying DHS requirements, provided Peterson agreed to destroy the stackable crib unit. Peterson agreed and soon received the new cribs.

Several months later, in July 2011, the DHS received a complaint from a parent of one of the children in Peterson's day care. The parent complained that her child, when placed into the stackable crib unit, looked as if the child was in a cage—the crib "is covered on top and has a door on it." In response, the agency sent social worker Michelle Lehman and child-care specialist Angie Huntington to Peterson's facility. During their unannounced visit on July 26, 2011, Lehman and Huntington saw the stackable crib unit in use in the nursery. They noticed one

---

[1] NICA is a federally funded program providing nursing and health education services in the community. NICA is not associated with or funded by the DHS; it is an independent entity.

child in a top crib with no mattress. Upon inquiry, Lehman and Huntington were informed the child, who appeared to be about two years old, did not have a mattress because she tended to throw it out. Lehman and Huntington reasoned that if the child had the strength to throw her mattress out of the crib, she likely also had the strength to climb out of the crib, presenting a significant fall risk. Additionally, both Dutch doors—doors split in the middle, allowing the top and bottom halves to open and close independently of one another—leading into the nursery were closed, and the children inside the nursery were not in the company of an adult nor were they within the line of sight of an adult.

Finally, Autumn King, Peterson's daughter, was the only adult in the child care facility when the DHS representatives arrived. King said she was an approved provider or was in the process of becoming approved. King further said Peterson was next door at her residence where she also provides child care. Lehman and Huntington told Peterson, once she arrived at the facility, about the dangers associated with the stackable crib unit and advised her not to use the top cribs. They drafted a safety plan in which Peterson agreed (1) to discontinue use of the top cribs until approved, (2) to leave the top half of the Dutch door open to the nursery for the purpose of supervision of the children, and (3) to have both providers at the facility when more than eight children were there.

Lehman and Huntington gathered additional information that prompted another visit, specifically:

> [C]are was being provided at the [personal home] address and that Ms. Taylor, a nurse consultant, had told Ms. Peterson that the cribs were unsafe and should be destroyed. Ms. Taylor gave Ms. Peterson three new cribs in exchange. In addition, we found that

Autumn King was not an approved co-provider and was not eligible to be in the home.[2]

Two days later, on July 28, 2011, Lehman and Huntington made an unannounced follow-up visit. When Lehman and Huntington arrived at Dana's Daycare, they found (1) Peterson was still using the stackable crib units, (2) King, again, was the only provider on site with more than eight children, and (3) both halves of the Dutch door were closed. Peterson had not followed any of the requirements of the safety agreement she signed on July 26. In the intervening two days, Peterson had consulted with her lawyer, who advised she could continue using the stackable crib unit because it had not been recalled. During the DHS follow-up visit, Peterson had her husband and son remove the stackable crib unit from the facility. During this same visit, the representatives confirmed reports Peterson had been providing child care in an unapproved location—her home.[3]

The DHS determined the risk for harm to the children met the classification of child abuse under Iowa Code section 232.68(2)(a)(4)(b), and because the risk was not minor, isolated, and unlikely to reoccur—the test used to determine registry placement—the DHS placed the incident on the abuse registry under Iowa Code section 232.71D(3)(b)(3). In addition to placing the

---

[2] King was not an approved provider because she had a history of drug convictions and was therefore prohibited from participating in child care for at least five years under DHS regulations. King last applied for registration as an approved child care provider in 2009, which would make her ineligible for registration until at least 2014.

[3] Peterson acknowledged providing care at her home next door to the day care facility. Lehman and Huntington told her that location was not safe and hazard free (given its unfenced pool) and all residents had not been approved for involvement with child care.

incident on the abuse registry, the agency also revoked Peterson's approval to provide registered child care services under Iowa Code section 237A.3A(3).

Peterson appealed the revocation and the placement of the incidents on the abuse registry. The administrative law judge (ALJ) conducted a hearing to resolve three issues:

> 1. Whether the [DHS] correctly classified reported incidents of child abuse as confirmed and registry placed.
> 2. Whether the [DHS] correctly determined [Peterson] is not eligible to provide child care or to receive public funds for providing child care as a result of the [DHS's] evaluation of the registrant's child abuse record.
> 3. Whether the [DHS] correctly cancelled a Child Care Assistance Provider Agreement.

When the ALJ affirmed all of the agency's decisions, Peterson requested review by the DHS director. The director affirmed the ALJ's decision. Peterson then appealed to the district court. *See Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762 (Iowa 2011) ("The district court may grant relief if the agency action has prejudiced the substantial rights of the petitioner, and the agency action meets one of the enumerated criteria contained in section 17A.19(10)(a) through (n)."). The court affirmed the final agency action, and Peterson now appeals.

## II. Standards of Review

Our review of an agency proceeding is governed by Iowa Code section 17A.19(10). We may "reverse, modify, or grant other appropriate relief" in this case if we determine that Peterson's substantial rights have been prejudiced because the DHS action "is not supported by substantial evidence [or] . . . not required by law and its negative impact on the private rights affected is so grossly

disproportionate to the benefits accruing to the public interest from that action that it must necessarily be deemed to lack any foundation in rational agency policy [or] . . . otherwise unreasonable, arbitrary, capricious, or an abuse of discretion." *See* Iowa Code §§ 17A.19(10)(f), (k), (n).

Substantial evidence is defined as "the quantity and quality of evidence that would be deemed sufficient by a . . . reasonable person, to establish the fact at issue." Iowa Code § 17A.19(10)(f)(1). Additionally, we view the evidence through the lens of the record as a whole. *Id.* § 17A.19(10)(f)(3). We give significant deference to the ALJ's finding of credibility. *Lange v. Iowa Dep't of Revenue*, 710 N.W.2d 242, 247 (Iowa 2006).

Because the district court acts in an appellate capacity to correct legal error by the agency, we review the district court's decision to see if we reach the same conclusions. *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 255–56 (Iowa 2012) (citing *Evercom*, 805 N.W.2d at 762).

### III. Analysis

#### A. Were the agency's decisions supported by substantial evidence?

##### 1. The finding of abuse

Peterson contends the evidence did not support the agency's founded-abuse determinations. One basis for the DHS finding of abuse was inadequate supervision. In other words, the agency determined Peterson "failed to provide proper supervision of a child that a reasonable and prudent person would exercise under similar facts and circumstances and the failure resulted in direct harm or created a risk of harm to the child." *See* Iowa Code § 232.68(2)(a)(4)(b).

Peterson contends the "concerns" expressed by the DHS representatives following their unannounced visits did not rise to the level of "substantial evidence" required to support the agency's decision. But viewing the record as a whole, those "concerns" reflected the observations and experience of workers with expertise in the field of child safety and were only part of the overall evidence considered by the agency.

The record contains extensive notes from nurse Taylor and from the DHS social worker regarding their investigations of Peterson's alleged child abuse and her lack of compliance with the applicable code provisions. The hearing transcript also includes the witnesses' testimony under oath as to their safety concerns regarding Peterson's use of the stackable crib unit, the supervision issues they noted, and their observations about Peterson's dishonesty during the investigation.

The question for the courts on appeal of agency action is not whether the evidence supports a different finding but whether the evidence supports the finding made by the agency. *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 218 (Iowa 2006). A court may not find a lack of substantial evidence just because the evidence could have led to a different conclusion. *Second Injury Fund v. Shank*, 516 N.W.2d 808, 812 (Iowa 1994).

The DHS representatives documented Taylor's recommendation Peterson stop using the stackable crib unit for safety reasons. While Taylor's suggestions admittedly did not carry the force of law because she was not an agent of the DHS, her suggestions show Peterson was aware of the fact the unit could be

problematic. Peterson later denied this knowledge, and her denial contributed to the agency's critical assessment of her veracity, an assessment adopted by the district court.

The record shows Peterson continued to use the stackable crib unit despite Taylor's concerns and despite Peterson receiving new, approved cribs. Further, Peterson continued to use the crib units despite being expressly told not to use them by the DHS representatives during their first unannounced visit. Peterson agreed not to use the top cribs in the signed safety plan completed during the first DHS visit. The record also shows multiple instances where the DHS representatives and Taylor noted the Dutch doors were closed, preventing adult supervision and resulting in children being unattended in the nursery.

The ALJ found a reasonable person would not leave children unattended and out of the line of sight of an adult, particularly when using a product deemed potentially risky. Further, the ALJ concluded that, unlike Peterson, a reasonable person would not continue to use the top units of the stackable crib after having been warned of their risks. The ALJ reasoned:

> There was credible evidence presented at hearing that the stackable crib unit posed a fall risk to children Peterson placed in there, due to their ages and mobility. There is no question that a child who is able to maneuver a mattress off of the bottom of crib and throw it over the side has the motor skills to potentially climb over the side of the crib rail.

Thus, the "quantity and quality of the evidence" presented here would "be deemed sufficient by a reasonable person to establish" the agency's conclusion. *See Missman v. Iowa Dep't of Transp.*, 653 N.W.2d 363, 366–67 (Iowa 2002) (noting challenger's "heavy burden" to establish lack of substantial evidence).

The evidence presented was, in large part, direct observations by DHS employees and notes recorded in official records of visits, investigations, and interviews. The ALJ found the evidence presented by the DHS to be credible and the rebutting evidence presented by Peterson not credible. We agree with the district court's resolution of this issue.

### 2. Entry of the founded abuse in the registry

Peterson next contends she should not have been placed on the child abuse registry. Peterson alleges a lack of substantial evidence to support entry of the founded reports into the registry because she immediately removed the offending crib unit during the second unannounced DHS visit. Peterson also insists the Dutch doors were never both closed while children were in the nursery.

When a report of child abuse is founded and judged to be "not minor or was not isolated or is likely to reoccur," then the abuse is to be entered into Iowa's central registry. Iowa Code § 232.71D(3)(b). To avoid being placed on the registry, Peterson must satisfy three conditions: the incident leading to the investigation must be (1) minor; (2) isolated; and (3) unlikely to reoccur. If all three conditions are not met, then the DHS must place the offender on the registry. *See* Iowa Admin. Code r. 441-175.39.

The DHS alleged, and the ALJ and district court agreed, Peterson's conduct did not show she could successfully meet all three conditions to avoid placement on the registry. While her use of the stackable crib unit did not result

in injuries, the DHS representatives judged the unit to present a severe risk of injury if a child able to climb out was placed in a top crib.

But even if we assume, as the ALJ did, that use of the top cribs was a minor infraction, Peterson was unable to satisfy the second and third conditions. The incident was not isolated—she used the stackable cribs for approximately four months. Further, her failure to provide proper supervision was likely to reoccur because, although Peterson had been first warned by Taylor and then expressly told to stop using the top cribs by the DHS representatives, she continued to use the top cribs until further action by the DHS prompted her to have family members disassemble them. The same is true of Peterson's practice of closing both Dutch doors while children were in the nursery. She was expressly told not to do so and was found to have continued the practice upon the next DHS visit two days later.

We agree with the district court's conclusion that substantial evidence supports the decision to place Peterson on the child abuse registry.

### 3. Revocation of Peterson's child care registration

Finally, Peterson alleges there was not substantial evidence to justify the revocation of her registration to provide child care. Iowa Code section 237A.12 vests the DHS with the discretion to make rules regarding the care of children in a home day care setting. The DHS is also given the responsibility for investigating allegations of child abuse in the day care homes it registers.

> Registration shall be denied or revoked if the department finds a hazard to the safety and well-being of a child and the provider cannot correct or refuses to correct the hazard [or] . . . if the

department determines that the provider has failed to comply with standards imposed by law and these rules.

Iowa Admin. Code r. 441-110.7(1).

Based on the agency's finding of an uncorrected hazard to children in Peterson's day care, the DHS revoked her registration. Although Peterson was warned the cribs and her child-supervision practices were troubling, she did not correct the concerns expressed to her. The revocation was based on the agency's findings of an uncorrected hazard and insufficient supervision. If those findings are founded, then so too is the revocation of the child care registration.

Additionally, the DHS based its decision on its assessment Peterson was not engaging honestly with its representatives, a finding credited by the ALJ and affirmed by the district court. Specifically, the DHS discovered Peterson's daughter, King, was an unapproved provider. Both King and Peterson persisted in asserting King was an approved provider, despite the fact that King had applied in the past and was informed she would not be eligible to provide child care for a period of five years; King's application occurred approximately two years before the incidents currently under review.[4]

---

[4] Also contributing to the ALJ's questions regarding Peterson's honesty was her continued insistence that her daughter, King, was an approved provider. In support, she presented an approval notice from the DHS that had been hand-modified and signed by King. The DHS's original version contained no such modification. Further, it was established during King's initial application to be an approved provider in 2009, the local DHS representative explained to King via phone why her application was denied and that she would not be eligible to be approved for five years. The phone call was followed by letters to King and Peterson; both women deny having received such letters. This led the ALJ to conclude, in an effort to deceive, Peterson and King altered the approval form. The district court adopted the ALJ's assessment in this instance as well.

The DHS representatives also received reports Peterson was providing care in an unapproved location—her home. Peterson's allowance of King to work in the day care despite her drug convictions, Peterson's care for children in her home despite it not being an approved location, and her dishonesty with DHS representatives all contributed to the revocation of Peterson's registration. The district court found substantial evidence supported the agency's ruling, and we agree with the district court.

**B. Does the private right implicated outweigh the public interest asserted?**

If the agency action is "[n]ot required by law and its negative impact on the private rights affected is so grossly disproportionate to the benefits accruing to the public interest from [the] action that it must necessarily be deemed to lack any foundation in rational agency policy," then the agency decision will be overturned on appeal. Iowa Code § 17A.19(10)(k). Citing this statute, Peterson asserts her private right to provide child care services and the living she makes from that endeavor outweighs the public interest in closing down her facility.

Peterson asserts the DHS can continue to exist without Peterson's business, but her business cannot continue to exist without DHS registration. This is most assuredly true. But the dichotomy does not prove the negative impact of the DHS action is "grossly disproportionate" to the resulting benefit to the public. *See Zieckler v. Ampride*, 743 N.W.2d 530, 533 (Iowa 2007) (analyzing section 17A.19(10)(k)); *cf. Doe v. Iowa Bd. Med. Exam'rs*, 733 N.W.2d 705, 711 (Iowa 2007) (individual's interest in professional license not exalted

over public interest in competent applicants). Peterson has failed to show her own, private interest in her business outweighs the public interest of insuring the safety of children allowed to be in her care.

**C. Was the agency action unreasonable, arbitrary, capricious, or otherwise an abuse of its discretion?**

Peterson characterizes the DHS decision to revoke its approval for Peterson's childcare activities, as well as her placement on the child abuse registry, as an "overreaction" and based in "unreasonable fears." Peterson must demonstrate "lack of rationality, focusing on whether the agency has made a decision clearly against reason and evidence. . . . The Court must 'broadly and liberally' apply the agency findings in order to uphold, rather than defeat, the agency's decision." *Stephenson v. Furnas Elec. Co.*, 522 N.W.2d 828, 831 (Iowa 1994) (quoting *Ward v. Iowa Dep't of Transp.*, 304 N.W.2d 236, 237 (Iowa 1981)). Abuse of discretion is synonymous with unreasonableness. *Id.* Agency action is arbitrary and capricious if it was made "without regard to the law or facts." *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 831 (Iowa 2002).

Peterson contends the agency's decisions were rooted in its representatives' concerns rather than in hard evidence. She alleges those concerns do not rise to the level of actual infractions or dangers. But, the court is "not free to interfere with any agency finding where there is a conflict in the evidence or when reasonable minds might disagree about the inference to be

drawn from the evidence, whether it is disputed or not." *Stephenson*, 522 N.W.2d at 831.

Peterson contends the DHS workers adopted the attitude "I know an infraction when I see one" and "I can make up the rules as I go along." To the contrary, the record shows Peterson was first warned in April of the potential for problems relating to the stackable crib unit. She was also provided with approved alternative cribs, and chose not to use them. Most tellingly, DHS representatives officially informed her that she needed to change her practices during their first unannounced visit to the home. When they returned two days later, she was still violating the safety plan she had signed and agreed to during the first visit. The agency actions were neither arbitrary nor capricious.

Peterson has not demonstrated the agency's decisions were reached without substantial evidence. She has not demonstrated that her private interest in operating a day care business outweighs the public's interest in assuring child safety. Finally, she has not demonstrated the agency's decisions were arbitrary and capricious. Accordingly, we affirm.

**AFFIRMED.**